UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| UAL Corporation, et al., | ) Chapter 11 |
| Debtors. | ) Case No.   02 B 48191 |
| Pension Benefit Guaranty Corporation, | ) |
| Plaintiff, | ) |
| v. | ) Adversary No. 05 A 00481 |
| United Air Lines, Inc., as Plan Administrator for the United Airlines Pilot Defined Benefit Pension Plan, | ) |
| Defendant, | ) |
| and | ) |
| Air Line Pilots Association, International, United Retired Pilots Benefit Protection Association, Roger D. Hall, Dennis D. Dillon, Gerard Terstiege, Eugene M. Cummings, Raymond P. Fink, James M. Krasno and William L. Rutherford, | ) |
| Intervenors. | ) |

**MEMORANDUM OF DECISION**

This adversary proceeding, brought by the Pension Benefit Guaranty Corporation ("PBGC"), seeks a decree terminating a pension plan sponsored by United Air Lines ("United"), whose Chapter 11 bankruptcy case is pending in this court. The proceeding is before the court for judgment after trial. The issue for trial was whether termination of the plan

tion—the United Airlines Pilot Defined Benefit Pension Plan (the "Pilot Plan")—was necessary, as of December 30, 2004, "to avoid . . . any unreasonable increase in the liability of [PBGC's insurance] fund." 29 U.S.C. § 1342(c). As discussed below, PBGC established by a preponderance of the evidence that termination was necessary to avoid an unreasonable increase in liability. Judgment will therefore be entered in favor of PBGC, ordering termination of the plan as of December 30, 2004.

## Jurisdiction and Factual Background

This proceeding was previously before the court on PBGC's motion for summary judgment. As set out in the opinion denying that motion, this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) as to which the court may enter a final judgment. *See Amended Memorandum of Decision on Motion for Summary Judgment*, at 2-3.

The undisputed background facts, reflected in the summary judgment opinion, can be summarized briefly. Pursuant to a collective bargaining agreement that it entered into with the Air Line Pilots Association, International ("ALPA"), United has maintained the Pilot Plan, offering benefits to approximately 15,000 active, retired, and terminated employees. On December 29, 2004, PBGC made an administrative determination under 29 U.S.C. § 1342(a)(4) that the Pilot Plan should be terminated as of December 30, and notified both United and ALPA of this determination. On December 30, notice of the determination was issued through advertisements in major newspapers, press releases, and announcements on the websites of the PBGC, United, and ALPA. As required by an agreement that it had reached with ALPA, United, as plan administrator, did not agree to termination of the plan as of December 30, although it had long maintained that the plan needed to be terminated.

In addition to providing notice of its administrative determination on December 30, PBGC also filed a complaint against United in the district court, seeking a judicial decree ad-

2

judicating that the plan must be terminated pursuant to 29 U.S.C. § 1342(c). That complaint was referred to this court and became the pending adversary proceeding. ALPA intervened in the proceeding, as did the United Retired Pilots Benefit Protection Association ("URPBPA"), a not-for-profit Illinois corporation formed in connection with United's bankruptcy to protect the pension benefits of its members.

PBGC moved for summary judgment, asserting that the court's role under § 1342(c) was to review PBGC's decision that termination was necessary, using the "arbitrary and capricious" standard applicable to judicial review of informal agency action under the Administrative Procedure Act, 5 U.S.C. § 706. In ruling on this aspect of the motion, this court held, to the contrary, that PBGC had to prove by a preponderance of the evidence the elements for relief under § 1342(c)—that is, that termination of the Pilot Plan was necessary "in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or to avoid any unreasonable increase in the liability of [PBGC's insurance] fund." Because there were facts in dispute regarding this issue, summary judgment was denied. At the same time, however, PBGC sought a determination of the sufficiency of its notice of termination on December 30, 2004. Here, the court ruled that the uncontested facts established that the notice was effective. Thus, if PBGC established its case for termination as of December 30, that would be the effective date for termination of the Pilot Plan.

The pretrial submissions of the parties limited the issue for trial to the final ground for termination set out in § 1342(c): whether termination of the Pilot Plan as of December 30, 2004 was necessary to avoid an "unreasonable increase in the liability of the fund."

### Findings of Fact

Most of the evidence at trial involved the extent of the loss that PBGC's fund would incur if termination of the Pilot Plan were delayed until after December 30, 2004. PBGC pre-

3

sented testimony from two actuaries on this question; ALPA and URPBA presented testimony from one additional actuarial expert apiece. The only other witness was a PBGC attorney whose testimony was ruled largely inadmissible. The documentary evidence consisted of excerpts from PBGC's administrative record and other internal documents (PBGC Ex. 1; ALPA Ex. 16-19); the agreements between United and ALPA, modifying their collective bargaining agreement, entered into during December 2004 (PBGC Ex. 3; ALPA Ex. 5) and January 2005 (ALPA Ex. 6); and reports and other materials prepared by the parties' expert witnesses (PBGC Ex. 4 and 5; ALPA Ex. 9, 13, and 21-25; URPBPA Ex. 1 and 2). United introduced no evidence.

The major factual disagreement—the precise extent of the increase in PBGC's liability that would result from termination of the Pilot Plan after December 30, 2004—is a narrow one. PBGC's experts testified that if the plan were terminated in January 2005 instead of December 2004, PBGC's liability would increase by $44 million; ALPA's expert testified that the increase would be $39 million. PBGC's experts testified that each month of further delay, through June 2005, would add $9.5 million to this increase in liability; ALPA's expert put the monthly increase at $6.7 million. See ALPA Ex. 21. Thus, PBGC contends that the total increase in its liability for the Pilot Plan from December 2004 through June 2005 would be $101 million, whereas ALPA contends that the increase would be $79 million. URPBPA's expert did not opine on this issue.

Under the legal standard applied below, these differences in calculating increased liability do not affect the need for plan termination on December 30, 2004. Nevertheless, the weight of evidence supports PBGC's position as to the January increase and ALPA's position as to the monthly increases thereafter.

As to the initial increase in liability, the experts agreed that a statutory increase in the maximum guaranteed pension would result in a substantial increase in PBGC liability since

4

many participants in the Pilot Plan were entitled to plan benefits in excess of the amount guaranteed by PBGC. For each of these participants, an increase in maximum benefits guaranteed by PBGC that became effective January 1, 2005 would add to the fund's liability if the plan were not terminated before that date. PBGC documented its calculation of this increased liability, and ALPA's expert gave no reason for his lower estimate.

However, as to the difference in monthly increases thereafter, PBGC failed to document its correction of an initial, acknowledged error in calculating the impact of a non-terminated plan paying benefits in excess of guaranteed amounts. See PBGC Ex. 6, with an imbedded footnote failing to reflect the correction. Moreover, ALPA's expert used a methodology that consistently reduced the monthly liability increases to present value. PBGC criticized this methodology as failing to account for factors affecting PBGC liability that were independent of the termination date, but PBGC did not demonstrate any such independent factors that would have artificially lowered the liability increase resulting from termination delay. In the end, then, the balance of the evidence adduced at trial indicates that PBGC faced an immediate liability increase of $44 million if the Pilot Plan were terminated in January 2005 rather than December 30, 2004, and that its liability would increase by $6.7 million each month thereafter through June 2005, resulting in a total increase in liability as of that date in the amount of $84.2 million.

### Conclusions of Law

*The applicable standard.* Whatever the increase in liability that PBGC would incur as a result of the Pilot Plan terminating after December 2004, the real question is whether the increase would be "unreasonable," as required for termination under § 1342(c). ALPA argues that the increase—whether $79 million, $101 million, or some point in between—would not be unreasonable, because the entirety of any such increase would be the result of the ordinary application of statutory provisions to the operation of the plan. And indeed, there were no

5

"extraordinary" events, such as plan amendments becoming effective after the proposed termination date, that would have increased the liability. PBGC, on the other hand, argues that any substantial increase in its liability for a plan—regardless of the cause of the increase—would be unreasonable under the statute and that, accordingly, an increase in the millions of dollars necessarily satisfies the requirement for plan termination.

There is room for dispute here, since the statute provides no definition of reasonableness in this context, and there is little helpful case law[1] or legislative history.[2] Nevertheless, the operation of § 1342(c) in the overall structure of ERISA, together with the change in its language enacted in 1980, indicates that an "unreasonable" increase in liability must involve both a monetarily significant increase in PBGC's liability and a plan likely to terminate in an underfunded condition, so that the increase in liability would be reflected in an actual additional loss for PBGC's insurance fund.

---

[1] The only published opinion discussing the meaning of an "unreasonable increase" in PBGC liability under § 1342(c), holds—contrary to the result reached by this court—that § 1342(c) places no burden on PBGC to establish an unreasonable increase in its liability, but rather requires parties opposing termination to establish that PBGC had acted arbitrarily or capriciously in asserting that such an increase would occur. *In re Pan American World Airways, Inc. Cooperative Ret. Inc. Plan*, 777 F. Supp. 1179, 1182 (S.D.N.Y. 1991). In that context, the court stated that an "unreasonable increase" in liability might be any increase in excess of "a slight or insubstantial deterioration in a plan's condition," caused, for example, by "day to day deviations as the normal vagaries of a plan's investments." *Id.* at 1182-83. The court applied this interpretation because there was "no showing" that it was incorrect. *Id.* It is questionable whether the court would have applied this interpretation had it placed the burden of establishing an unreasonable liability increase on PBGC.

[2] As discussed in *Pan Am.*, 777 F.Supp at 1182, the "unreasonable increase" language now in § 1342(c) was "further increase" in the original version of ERISA. The change was made by § 402(a)(6)(D) of the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96-364. However, this change was not mentioned either in the House Report on this legislation, H.R. Rep. No. 96-869, or in any of the floor debates. Two committee prints on the legislation merely reflect the changed language in § 1342(c), offering no analysis of the impact of the change or its rationale. Staff of Subcomm. on Labor-Management Relations of House Education and Labor Comm., Changes in Existing Law Made by the Bill H.R. 3900 49 (Comm. Print 1980); Staff of Sen. Comm. on Labor and Human Resources, S. 1076 The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration 100, 246 (Comm. Print 1980).

*PBGC v. Heppenstall Co.*, 633 F.2d 293, 295-97 (3d Cir. 1980), the first court of appeals decision to address ERISA's program of pension insurance, explains the basic features of the program. PBGC administers a fund to guarantee minimum benefits to participants in pension plans that terminate without sufficient assets to pay the benefits promised. PBGC's fund is self-financed, primarily through premiums charged to the plans covered by the insurance program. When a plan operates without sufficient funding, PBGC's liability to the plan participants can increase in several ways, including depletion of the plan assets and increases in PBGC's guaranteed payouts. If PBGC and the plan administrator (usually the employer) agree that an underfunded plan should be terminated as of a particular date, PBGC takes over administration of the plan's assets as trustee and begins paying the benefits defined by statute as of the termination date. If the plan administrator does not agree to a termination date PBGC proposes, then PBGC must obtain a judicial decree terminating the plan and establishing the termination date.

In *Heppenstall,* the court was required to determine what standards should govern a court's choice of a termination date under 29 U.S.C. § 1348(b)(2). The court approached this question by identifying the competing interests involved: PBGC's interest as an insurer in promptly terminating an underfunded plan in order to avoid additional losses to its insurance fund, and the plan participants' interest in receiving expected plan benefits. *Heppenstall*, 633 F.2d at 301-02. A similar approach is appropriate in defining the "unreasonable increase in liability" that requires termination of a plan under § 1342(c). This ground for termination balances the same interests that *Heppenstall*—PBGC's interest as insurer is advanced by terminating a plan if continued operation will likely deplete PBGC's insurance fund; the participants' interest in receiving expected benefits is advanced by not terminating a plan if such depletion is unlikely.

7

The likelihood of a depletion of PBGC's fund, then, is the touchstone, and it implies the consideration of both increased liability and likelihood of plan termination. First, even with a severely underfunded plan, continued operation may not lead to increased liability for PBGC. If the plan's own benefits are below the statutorily guaranteed levels and payouts under the plan are not increasing, continued operation of the plan will not increase PBGC's liability. Second, even if PBGC's liability does increase significantly, the increase will not lead to a loss to PBGC if the plan is be able to continue in operation successfully, through increased future contributions from the sponsor or otherwise. The increase in liability in this situation would not be "unreasonable."

The most plausible reading of the action Congress took in amending § 1342 (*see* n.2, *supra*) supports this interpretation. By changing "further increase" to "unreasonable increase," Congress necessarily recognized the possibility that PBGC could be required to accept certain increases in liability arising from continued operation of underfunded plans. Given the interests of the parties involved, these "reasonable" increases would be those resulting from plans that can operate successfully.

ALPA's contrary argument—that any increase in liability is reasonable if it occurs in the ordinary course of a plan's operation, rather than as a result of some extraordinary event such as a plan amendment—simply ignores the interest of the PBGC that involuntary termination is intended to protected. ALPA's interpretation would allow a plan to continue indefinitely, exhausting its assets, while PBGC's liability for guaranteed payments increased, so long as no extraordinary event intervened. There is no basis for reading such an intent into the statute.

*Application of the standard.* When the two-part standard for an unreasonable increase in liability is applied to the facts in this case, it becomes apparent that PBGC has established cause for termination. First, the increase of $44 million that PBGC would incur if termination

8

does not occur before January 1, 2005, is certainly a significant amount. Liability increases of much smaller amounts have been seen as grounds for termination, without argument. *See, e.g., Heppenstall*, 633 F.2d at 300 (noting termination based on an increase in liability of $3-4 million). Although this increase may not be large in relation to PBGC's overall liability for the Pilot Plan, that cannot be the appropriate standard when PBGC's interest in protecting its fund is considered. The impact of increased liability on PBGC's insurance fund is not changed by total liability a particular plan presents. To protect its fund, § 1342(c) allows PBGC to seek to avoid any significant increases in liability with respect to plans likely to fail.

Second, the only evidence bearing on the issue indicates that the Pilot Plan would not continue.[3] PBGC's administrative record reflected United's repeated statements in this case that termination of all of its defined benefit pension plans would be necessary for it to reorganize successfully, and United's agreements with ALPA and the PBGC contemplated such a termination. Accordingly, even though no witness testified on the subject, PBGC sustained its burden of establishing the likelihood of plan termination.

## Conclusion

As discussed above, PBGC has shown that continued operation of the Pilot Plan beyond December 30, 2004 would result in an unreasonable increase in the liability of its fund, and so is entitled to a decree pursuant to 29 U.S.C. § 1342(c) terminating the plan as of that date. The decree will be issued in a separate document.

Dated: October 26, 2005

Eugene R. Wedoff
United States Bankruptcy Judge

---

[3] URPBPA's expert advanced the theory that termination of the Pilot Plan was not necessary because an amended defined benefit plan could be successfully implemented. However, the expert acknowledged that United was not willing to pursue such an amendment, and so this alternative, even if theoretically possible, was unlikely to occur.